Robert D. BERRY and Andrew Dudney, Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY; Texas Farmers Insurance Company; and Mid–Century Insurance Company of Texas, Appellees.

No. 03–98–00718–CV.

Court of Appeals of Texas, Austin.

Jan. 6, 2000.

Jerry Galow, Watson, Bishop, London, and Galow, P.C., Jeffrey Thomas Knebel, Jackson Walker, L.L.P., Austin, for Andrew Dudley.

Jeffrey Thomas Knebel, Jackson Walker L.L.P., Austin, for Mid-Century.

Robert B. Neblett, III, Jackson Walker L.L.P., Larry F. York, Baker & Botts, Austin, for Texas Farmers.

Alice London, Watson, Bishop, London and Galow, P.C., Austin, for Robert D. Berry.

Bob E. Shannon,, Baker & Botts, Austin, for State Farm.

Before Chief Justice ABOUSSIE, Justices KIDD and B.A. SMITH.

MACK KIDD, Justice.

Appellants Robert D. Berry and Andrew Dudney sued appellees, State Farm Mutual Automobile Insurance Company, Texas Farmers Insurance Company, and Mid–Century Insurance Company of Texas (collectively, "the insurers"), for allegedly violating article 5.07–1 of the Texas Insurance Code by refusing to cover the full cost of original manufacturer replacement parts pursuant to the claims appellants filed under their standard Texas personal automobile insurance policies. *See* Tex. Ins.Code Ann. art. 5.07–1 (West Supp.2000). Both sides moved for summary judgment. The trial court granted the insurers' motion for summary judgment and denied appellants' motion on grounds that Berry and Dudney had failed to plead facts establishing a cause of action under article 5.07–1. Berry and Dudney now appeal the trial court's decision, challenging its construction of the statute. We will affirm the judgment.

### Statutory Background

The sole issue in this appeal involves the proper construction of article 5.07–1 of the Texas Insurance Code, subsection (a) of which provides as follows:

#### Repair of Motor Vehicles; Disclosure of Consumer Information

(a) Except as provided by rules duly promulgated by the commissioner, under an auto insurance policy that is delivered, issued for delivery, or renewed in this state an insurer may not, directly or indirectly, limit its coverage under a policy covering damage to a motor vehicle by specifying the brand, type, kind, age, vendor, supplier, or condition of parts or products that may be used to repair the vehicle or by limiting the beneficiary of the policy from selecting a repair person or facility to repair damage to the motor vehicle covered under the policy.

Tex. Ins.Code Ann. art. 5.07–1(a) (West Supp.2000). This provision was an amendment to a 1991 insurance reform bill designed to restructure the regulation of the insurance industry in Texas. *See* Act of May 2, 1991, 72d Leg., R.S, ch. 242, 1991 Tex. Gen. Laws 939. Article 5.07–1, in particular, was enacted in response to the perceived unfairness of the claims-settlement practices of many automobile insurance companies. Specifically, it appears that insurance companies were regularly forcing policyholders to patronize only certain designated repair shops as a condition of coverage.[1] Thus, policyholders could not choose where to have the repairs made if they wished to have the bill paid by their insurance company. The Legislature's committee hearings and floor debates indicate that article 5.07–1 was largely motivated by a desire to stop this practice and thereby provide policyholders with the freedom to choose where to have their automobiles repaired, as well as to encourage competitive bidding among various repair shops. *See* Hearing on Tex. H.B. 2 Before House Comm. on Ins., 72d Leg., R.S. (April 2, 1991) (tape available from House Committee Coordinator's Office); Hearing on Tex. S.B. 1303 Before Senate Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape available from Senate Staff Services Office); Debates on Tex.

---

1. The summary-judgment evidence in the record indicates that pressure to enact this legislation originated with a group of independent glass contractors who complained that they were losing business as a result of private "networking" arrangements made between insurance companies and large windshield manufacturers. Pursuant to these arrangements, many insurers were entering into exclusive contracts with windshield manufacturers and certain "preferred" independent shops whereby the insurance companies would require policyholders to use only those specified shops when having repairs made under their policies in return for the repair shops' pledge to use less expensive aftermarket replacement parts.

H.B. 2 on the Floor of the House, 72d Leg., R.S. (May 1 and May 27, 1991) (tapes available from House Committee Coordinator's Office).

A secondary motivation behind article 5.07–1, and the one with which we are concerned here, was a desire to give policyholders a choice of what parts to use in making the repairs. In the automotive industry, there are three general classes of replacement parts. The first class is comprised of new parts made by or on behalf of the automobile's original manufacturer. These are commonly referred to as new Original Equipment Manufacturer parts or "OEM parts." The second class of parts, including used, reconditioned, recycled, and salvaged OEM parts, is normally referred to as used parts. The third class includes aftermarket parts or those parts that are not made or used by the automobile's original manufacturer. These aftermarket parts, along with used parts, are normally collectively referred to as "non-OEM" parts.[2]

Until recent years, repairing automobiles with non-OEM parts was not an option because as a practical matter, the only available replacement parts were those produced by or on behalf of the automobile's original manufacturer. But recently, the aftermarket parts industry has flourished and insurers nationwide have since routinely used the price of non-OEM parts as a basis to calculate the amount they will pay for the replacement parts used in repairs. Because these non-OEM parts are often significantly less expensive than new OEM parts, insurance companies are able to save millions of dollars each year by this practice.[3]

Although the use of non-OEM parts in automobile repairs has been economically beneficial to insurers, the widespread use of these parts has raised many concerns that are important in framing this dispute. Many of the serious problems associated with the use of non-OEM parts were presented to the Legislature in committee hearings and floor debates during the 1991 legislative session. The House and Senate committees heard substantial testimony indicating that many non-OEM parts consistently fail to provide the same fit, quality, and safety as their new OEM counterparts. *See* Hearing on Tex. H.B.2079 Before House Comm. on Ins., 72d Leg., R.S. (April 2, 1991) (tape available from House Committee Coordinator's Office); Hearing on Tex. S.B. 1303 Before Senate Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape available from Senate Staff Services Office). According to many of the witnesses and the sponsors of each bill, these parts are often made according to different specifications and frequently do not fit the automobiles for which they are intended; are more likely to rust or corrode due to inadequate priming and corrosion protection; and are often structurally inferior, providing less safety protection in collisions than new OEM parts. *See* Hearing on Tex. S.B. 1303 Before Senate Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape available from Senate Staff Services Office). Of particular concern is the use of non-OEM "crash parts" such as hoods, bumpers, and fenders. Apparently, these parts often are not tested in accordance with federal safety regulations, and their inferior performance in collisions is potentially life-threatening. Furthermore, it appears that repairs made with non-OEM parts often void existing warranties and reduce the vehicle's resale value.

---

**2.** As a practical matter, used, reconditioned, recycled, and salvaged OEM parts (collectively, "used parts") are usually classified with non-OEM parts—notwithstanding the fact that they were at one time new OEM parts. For purposes of this discussion, all references to non-OEM parts should be deemed to refer to used parts as well.

**3.** A schedule included in the record indicates that from 1984 to 1994, State Farm saved over $100 million each year by using non-OEM parts in adjusting its claims. Over that same ten-year period, the schedule shows that State Farm saved a total of over $1.25 billion.

At the time the Legislature first heard these concerns, it was considering two related pieces of legislation, House Bill 2079 and Senate Bill 1303. *See* Tex. H.B.2079, 72d Leg., R.S. (1991); Tex. S.B. 1303, 72d Leg., R.S. (1991). Although both bills ultimately failed to pass, they were important precursors to the amendment to House Bill 2 which became codified as article 5.07–1. *See* Act of May 2, 1991, 72d Leg., R.S., ch. 242, § 2.11, 1991 Tex. Gen. Laws 939, 958, *since amended* by Act of April 28, 1997, 75th Leg., R.S., ch. 399, § 1, 1997 Tex. Gen. Laws 1637, 1637–38, *codified at* Tex. Ins.Code Ann. art. 5.07–1 (West Supp.2000).

### Procedural Background

This specific controversy arises out of two separate insurance claims appellants Berry and Dudney filed with their automobile insurance companies for damages their vehicles sustained in two unrelated traffic accidents. The claims adjusters for the insurers evaluated the damage to Berry's five-year-old van and Dudney's three-year-old car and prepared estimates reflecting the amounts they would pay for the necessary repairs. These estimates included itemized breakdowns indicating the amounts the insurers were willing to pay for each part that needed to be replaced.

Some of the parts listed on the estimates were accompanied by the notation "LKQ," an abbreviation for "like kind and quality." This notation indicated that the insurers were basing the amount of compensation they would provide for the designated part on the price of a non-OEM replacement part rather than a new OEM part. Upon realizing the significance of the "LKQ" designation, Berry and Dudney protested and requested that they be paid the amount of money necessary to have their vehicles repaired with new OEM parts. Mid–Century and State Farm refused and

advised Berry and Dudney that if they wanted new OEM parts, Berry and Dudney would be responsible for paying the difference in price. Faced with the choice of accepting non-OEM parts or making up the difference in cost, Berry opted to pay the extra money and have his van's rear bumper and taillight replaced with new OEM parts. Dudney, on the other hand, elected to have his car's front grill, bumper, and pinstriping replaced with non-OEM parts.

Berry and Dudney proceeded to file separate suits against State Farm, Mid–Century, and Texas Farmer's Insurance on their own behalf and on behalf of a proposed plaintiff class of policyholders, alleging, *inter alia*, breach of contract, breach of the duty of good faith and fair dealing, and violations of the Deceptive Trade Practices Act and the Unfair Claim Settlement Practices Act. *See* Tex. Bus. & Com. Code § 17.46 (West Supp.2000); Tex. Ins. Code Ann. art. 21.21–2 (West Supp.2000). They eventually consolidated their suits and abandoned their claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Deceptive Trade Practices Act and the Unfair Claim Settlement Practices Act.

Thereafter, appellants proceeded solely on the theory that the insurers had limited appellants' coverage and thereby violated article 5.07–1 of the Insurance Code by specifying the type, kind, or condition of the parts that could be used to repair their vehicles. Appellants further maintained that the insurers were "improperly limiting coverage to an amount less than the actual cost of the replacement part[s] via 'depreciation' or 'betterment.' " [4] As their remedy, Berry and Dudney requested that the court order the insurers to pay for the difference between the cost of the used or non-OEM parts and the cost of new OEM parts. The insurers responded with a mo-

---

4. Appellants' argument is essentially that the insurers are prohibited from taking a credit—also referred to as a "betterment"—in the event a replacement part makes the repaired

vehicle more valuable than it was in its pre-accident condition. *See Great Tex. County Mut. Ins. Co. v. Lewis,* 979 S.W.2d 72 (Tex. App.—Austin 1998, no pet.).

tion for summary judgment, maintaining that as a matter of law, article 5.07–1 does not *require* insurance companies to pay for new OEM parts in satisfaction of every valid insurance claim and that appellants failed to plead facts sufficient to establish a cause of action under article 5.07–1. Berry and Dudney countered with their own cross-motions for summary judgment.

After considering the arguments of counsel and the summary-judgment proof, the trial court ruled in favor of the insurers on both motions. In granting the insurers' motion for summary judgment and denying Berry and Dudney's cross-motion, the trial court held that the insurers may, consistent with article 5.07–1, use non-OEM parts in writing repair estimates so long as the insurers pay an amount sufficient to purchase and install replacement parts of like kind and quality as required by the standard Texas personal automobile insurance policy.[5]

## DISCUSSION

■ The sole issue presented is strictly one of statutory construction. We must decide whether article 5.07–1 of the Texas Insurance Code requires auto insurers to pay for new OEM parts to the exclusion of all other parts when adjusting claims made under a standard Texas personal automobile insurance policy. *See* Tex. Ins.Code Ann. art. 5.07–1 (West Supp.2000). At the outset, we emphasize the limited scope of our decision. We do not decide here whether the non-OEM parts on which appellants' insurers based their estimates satisfy the insurers' contractual obligation to provide for replacement parts of like kind and quality. Because appellants abandoned this issue at the trial-court level when they dispensed with their breach-of-contract claim, this question is not properly before us. Nor do we express any opinion as to whether the evidence would support a finding of misrepresentation or

fraud under the Deceptive Trade Practices Act or the Unfair Settlement Claims Practices Act. *See* Tex. Bus. & Com.Code Ann. § 17.41 (West 1987 & Supp.2000); Tex. Ins.Code Ann. art. 21.21 (West 1981 & Supp.2000). Appellants also abandoned these causes of action at the trial court. Rather, the only issue before us is the proper construction of article 5.07–1 of the Insurance Code.

■ Both parties acknowledge that, in addition to its statutory authority, this provision was made contractually binding because it was incorporated into their policy when enacted. They disagree, however, on the correct interpretation of the statute and its effect on the remainder of the standard Texas automobile insurance policy. Specifically, the parties dispute the statute's impact on the provision that contractually limits the insurers' liability. That provision reads:

Our limit of liability for loss will be the lesser of the:

(1) Actual cash value of the stolen or damaged property;

(2) Amount necessary to repair or replace the property with other of *like kind and quality;* or

(3) Amount stated in the Declarations of this policy.

(Emphasis added.)

The crux of this dispute involves the second, so-called "like kind and quality" provision. Berry and Dudney maintain that this provision has been abrogated to the extent it conflicts with article 5.07–1. They contend that by adjusting claims using the price of non-OEM parts—even if they are non-OEM parts of like kind and quality—the insurers are violating article 5.07–1 by directly or indirectly limiting the policyholders' coverage by specifying the type, kind, or condition of the parts that may be used to repair their vehicles. Consequently, appellants argue that insurers

---

5. The Department of Insurance promulgates standard Texas personal automobile insurance policy forms that specify the minimum coverage insurance companies must provide to their policyholders in Texas. *See* Tex. Ins. Code Ann. art. 5.06 (West Supp.2000).

must *always* pay for OEM parts, absent the enactment of administrative rules providing otherwise, and that the "like kind and quality" provision in the standard Texas automobile insurance policy is now invalid insofar as it would otherwise allow insurers to pay only for the cost of non-OEM parts of like kind and quality. Appellants insist that any other interpretation would render the statute meaningless.

Although we share appellants' concerns about the many problems associated with the use of non-OEM parts, we cannot conclude that the Legislature, by enacting article 5.07–1, intended to revoke the "like kind and quality" provision of the standard automobile insurance policy, thus requiring insurers to pay for new OEM replacement parts in satisfaction of all valid claims, regardless of the age and condition of the vehicle before the accident and the availability of non-OEM parts of like kind and quality. Such a holding would violate the legislative intent behind article 5.07–1, as well as the deference we are obligated to give to the interpretation the Texas Department of Insurance (the "Department") has given the statute.

■ Determining the proper construction of a statute and the propriety of a ruling on a motion for summary judgment are both questions of law. *See Texas Med. Liab. Trust v. Zurich Ins. Co.*, 945 S.W.2d 839, 842 (Tex.App.—Austin 1997, pet. denied); *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex.1989). To prevail on a motion for summary judgment, the movant must establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). Rendition of summary judgment is proper when a respondent has failed to state a cause of action upon which relief can be granted. *See Holt v. Reprod. Servs., Inc.*, 946 S.W.2d 602, 605 (Tex.App.—Corpus Christi 1997, pet. denied); *Cole v. Hall*, 864 S.W.2d 563, 566 (Tex.App.—Dallas 1993, writ denied).

■ The determination here of whether Berry and Dudney stated a viable cause of action is entirely dependent upon how we construe article 5.07–1. Our analysis is guided by well-established rules of statutory construction. The fundamental rule controlling the construction of a statute is to ascertain the intent of the Legislature as expressed in the language of the statute and to give effect to that intent. *See Hidi v. State & County Mut. Fire Ins. Co.*, 988 S.W.2d 441, 445 (Tex.App.—Austin 1999, pet. filed); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex.1994). When determining legislative intent, we look to the language of the statute, the legislative history, the circumstances under which the statute was enacted, the object sought to be obtained, the consequences of a particular construction, and the administrative construction of the statute. *See* Tex. Gov't Code Ann. § 311.023 (West 1998)*; Union Bankers Ins. Co.*, 889 S.W.2d at 280; *Hidi*, 988 S.W.2d at 445. We also consider at all times "the old law, the evil, and the remedy." Tex. Gov't Code Ann. § 312.005 (West 1998). Finally, we give serious consideration to an agency's interpretation of an ambiguous statute that the agency is charged with enforcing, especially when it has special expertise in the area, so long as that interpretation is reasonable. *See Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex.1993); *Texas Utils. Elec. Co. v. Sharp*, 962 S.W.2d 723, 726 (Tex.App.—Austin 1998, pet. denied).

With these principles in mind, we turn to the language of the statute. First, we observe that there is no language in article 5.07–1 expressing any intent to abrogate the "like kind and quality" standard that has served as a limitation of liability under the standard Texas automobile insurance policy since 1979. Furthermore, there is no indication that the legislature intended to *affirmatively* require insurers to pay for new OEM parts in every claim or to otherwise prohibit the use of non-OEM parts when adjusting claims. Had

the legislature intended to mandate the universal use of OEM parts, it certainly could have done so by express language. The statute instead contains a series of prohibitions involving insurance carriers and their obligations, but it is completely silent regarding any affirmative duty; the statute expressly leaves this to the Department.

Next, as both parties agree and as is evident from the House floor debates, the harm that article 5.07–1 was intended to remedy was primarily the insurers' practice of forcing policyholders to have their vehicles repaired only at specified shops and, secondarily, their dictating the types of replacement parts that could be used to make the repairs. *See* Debates on Tex. H.B. 2 on the Floor of the House, 72d Leg., R.S. (May 1 and May 27, 1991) (tapes available from House Committee Coordinator's Office). Prior to the enactment of article 5.07–1, many insurers had formed alliances with particular automobile repair shops and forced their policyholders to use only those shops. In return for this guarantee of business, these shops agreed to repair the policyholders' vehicles using only the non-OEM parts specified by the insurers. Article 5.07–1 was passed to prohibit this practice. As a result, policyholders are now not only free to choose the shop where their vehicle is repaired, but they are also free to make the ultimate decision of what parts will be used.

To be sure, some individual legislators shared Berry and Dudney's concerns and expressed a desire to severely restrict the use of non-OEM parts. But the legislative history surrounding the evolution of the statute's wording reveals that the Legislature, by enacting only the amendment to

House Bill 2 instead of the two original stand-alone bills, did not intend the result appellants suggest.[6] The legislative history indicates that the legislative body rejected the restrictions that appellants urge article 5.07–1 imposes.

■■■ The deletion of a provision in a pending bill discloses a legislative intent to reject the proposal. *See Transportation Ins. Co. v. Maksyn,* 580 S.W.2d 334, 337–38 (Tex.1979). Just as we assume that every word in a statute has been used for a purpose, we presume that every word excluded was excluded for a purpose. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 888 S.W.2d 921, 926 (Tex.App.—Austin 1994, writ denied). A review of the proposed bills shows that the range of proposed restrictions on insurers was progressively narrowed as the statute's language made its way through the legislative process. Indeed, the legislature considered and rejected language that would have specifically and unambiguously provided for what appellants claim article 5.07–1 requires. Subsections (b) and (d) of proposed Senate Bill 1303 read:

> (b) An insurer may not require the use of non-original aftermarket crash parts in the repair of an insured's motor vehicle unless:
>
> (1) the insured has consented in writing; and
>
> (2) the insurer has given the insured a written estimate that meets the requirements of Subsection (c) of this section.
>
> · · ·
>
> (d) *If the insured refuses to give written consent to the use of nonoriginal after-*

---

**6.** Contrary to Berry and Dudney's assertion, the legislative history does not indicate any intention to require insurers always to pay for the cost of new OEM parts when adjusting claims. In fact, Representative Cavazos, the sponsor of House Bill 2079 and one of the amendment's supporters, commented during the floor debate on House Bill 2 that the amendment that would become article 5.07–1 would not preclude the use of non-OEM

parts, so long as those parts equaled or exceeded the original manufacturer's specifications. *See* Debate on Tex. H.B. 2 on the Floor of the House, 72d Leg., R.S. (May 27, 1991) (tape available from House Committee Coordinator's Office). Representative Cavazos explained, "What we're trying to prevent is that insurance companies mandate to auto body shops that they use after-market parts." *Id.*

*market crash parts, the insurer shall have the insured's motor vehicle repaired with aftermarket crash parts made by or for the manufacturer of the motor vehicle.* An insurer may not charge an insured an additional fee for the use of original aftermarket crash parts.

Tex. S.B. 1303, 72d Leg., R.S. (1991) (emphasis added).

This language would have accomplished precisely what appellants maintain article 5.07–1 provides, i.e., a right to require insurers to pay for the full cost of new OEM parts. But the Legislature declined to adopt the proposal. Instead, it chose language more similar to that found in proposed House Bill 2079.[7] And even then, only a *portion* of House Bill 2079 became law. The Legislature refused to adopt language that would have prohibited insurance companies in certain instances from controlling or limiting in any way the brand, type, kind, age, *price*, quality, or condition of replacement parts or products for which the insurer would *compensate* the insured. *See* Tex. H.B.2079, 72d Leg., R.S. (1991). That provision, which would have prohibited insurers from limiting the amount they would compensate policyholders for replacement parts, was rejected along with Senate Bill 1303 in its entirety. As a result, we are left only with the enacted language.

■ Because it rejected language that would have reached the result Berry and Dudney seek here, the Legislature thereby demonstrated its intent to prohibit insur-

ers only from directly or indirectly limiting coverage by *specifying* the parts to be used—not from using the cost of non-OEM parts of like kind and quality as a basis for calculating the proper amount of *compensation* to provide. This intent becomes even more clear once we consider that the Legislature is assumed to enact a statute with complete knowledge of the existing law and with reference to it. *See Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We believe this same assumption should apply with regard to the Legislature's awareness of the existing rules and regulations enacted by a state agency pursuant to the authority conferred to it by the Legislature. Had the Legislature disapproved of the "like kind and quality" provision that the Department incorporated into the standard Texas auto insurance policy as it was authorized to do under article 5.06 or 5.96, the Legislature easily could have revoked that provision when it amended article 5.07–1 during the 1997 legislative session. *See* Act of April 28, 1997, 75th Leg., R.S., ch. 399, § 1, 1997 Tex. Gen. Laws 1637, 1637–38. Instead, the provision has remained unaltered since 1991 through four legislative sessions.

■ Our interpretation is further supported by the construction the Department has given article 5.07–1. While not controlling, the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *See Quick v. City of Austin,* 4 S.W.3d 193, 207 (Tex.1998); *State v. Public Util. Comm'n,* 883 S.W.2d 190, 196

---

7. Proposed House Bill 2079 read:

(a) An insurer may not limit its coverage under a policy covering damage to a motor vehicle by specifying the brand, type, kind, age, or condition of parts or products that may be used to repair the vehicle, *or otherwise control or limit in any way,* directly or indirectly, the brand, type, kind, age, *price,* quality or condition of replacement parts or products for which the insurer will *compensate* the insured, unless:

(1) that limitation is clearly and prominently displayed on the face of the policy or certificate in lieu of a policy; and

(2) within three days after receiving notice of a claim, the insurer serves actual notice of the limitation on the insured and lienholder, if any, and on any appropriate repair facility.

(b) An insurer that fails to comply with the terms of this section may not limit, directly or indirectly, the brand, type, kind, age, price, quality or condition of parts or products that may be used to repair a damaged vehicle *and shall pay for the parts and products chosen by the insured.*

Tex. H.B.2079, 72d Leg., R.S. (1991) (emphasis added).

(Tex.1994). If a statute can be reasonably read as the agency has ruled, and that reading is in harmony with the rest of the statute, then we are bound to accept that interpretation even if other reasonable interpretations exist. *See City of Plano v. Public Util. Comm'n,* 953 S.W.2d 416, 421 (Tex.App.—Austin 1997, no pet.) (citing *Quorum Sales, Inc. v. Sharp,* 910 S.W.2d 59, 64 (Tex.App.—Austin 1995, writ denied)).

The Legislature has assigned to the Department the authority to enforce art. 5.07–1 and the other provisions of the Insurance Code. *See* Tex. Ins.Code Ann. art. 1.10, §§ 1, 7 (West Supp.2000). The Department has never interpreted article 5.07–1 to require insurers to pay for new OEM parts when settling claims, save those situations where only a new OEM part would satisfy the "like kind and quality" requirement of the policy. In a 1991 staff petition, a division of the Department specifically concluded that the "like kind and quality" policy provision remained operative, notwithstanding the passage of article 5.07–1. It determined that "the words 'of like kind and quality' are general words that do not appear to specify 'the brand, type, age, or condition of parts or products' to be used." Later, upon adopting section 5.501 of the Texas Administrative Code—an administrative rule designed to implement and ensure compliance with article 5.07–1—the Department emphasized that the insurers' liability was limited to a "reasonable rate of reimbursement" and made no mention of any prohibition against using non-OEM parts as a basis for calculating the appropriate amount of compensation. *See* 28 Tex. Admin. Code § 5.501(d) (1993). The Department then issued a 1995 bulletin in which the Commissioner stated that the "limitation of reimbursement to the reasonable cost of necessary repairs is not a violation of the statute." Commissioner's Bulletin No. B–0004–95 (March 21, 1995). And finally, in a 1996 notice sent to State Farm, the Department further clarified its position, declaring that a correct interpretation of

article 5.07–1 leads to "neither the extreme of requiring original equipment manufacturer parts, nor the extreme of allowing the insurer to specify parts." It reiterated that insurers need only pay for the reasonable cost of parts of like kind and quality.

The Department has thus consistently stated that the "like kind and quality" provision of the standard Texas automobile policy remains unaffected and has construed the statute only to prohibit insurers from dictating to the policyholders the specific repair shop and parts that must be used as a condition of coverage. Rather than interpreting it as a prohibition against using the price of non-OEM parts of like kind and quality as a benchmark for calculating the reasonable cost of replacement parts, the Department has always considered article 5.07–1 to be a prohibition against forcing policyholders to use specific repair shops or replacement parts. Furthermore, we point out that the Legislature has subsequently amended article 5.07–1 and declined to alter any of the statutory language material to this dispute, thus acquiescing in the Department's interpretation. *See Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 248 (Tex. 1991); *Central Power & Light Co. v. Sharp,* 919 S.W.2d 485, 489 (Tex.App.—Austin 1996), *writ denied per curiam,* 960 S.W.2d 617 (Tex.1997). The doctrine of legislative acceptance provides that when an agency's interpretation of a statute with doubtful meaning is in effect at the time the Legislature amends the law without making substantial changes to the statute, the Legislature is deemed to have accepted the agency's interpretation. *See Fleming Foods of Texas, Inc. v. Sharp,* 951 S.W.2d 278, 281–82 (Tex.App.—Austin 1997, pet. denied). Because the Legislature amended article 5.07–1 in 1997 without making any substantial changes, we conclude that it has ratified the Department's interpretation.

Appellants nevertheless contend that even if we reach this conclusion, such an

interpretation is impermissible because it results in an irreconcilable conflict between the statute and the "like kind and quality" policy provision, deprives the statute of all meaning, and provides policyholders with no more protection than they had before the statute's enactment. We disagree.

While we observe that there is some tension between the "like kind and quality" policy language and the statutory prohibition against directly or, more significantly, *indirectly* limiting a policyholder's coverage by specifying the type, kind, or condition of parts that may be used to repair the vehicle, we believe the two provisions can be reconciled. Although the statute takes away from insurers the power to *specify* the type, kind, or condition of the parts actually used to repair vehicles, insurers are nevertheless only obligated to *pay* for parts of like kind and quality in accordance with the standard policy provision. In other words, although insurers are prohibited from *forcing* policyholders to accept non-OEM parts, the amount of money that insurers must provide as compensation for the parts that policyholders ultimately choose may still be limited to the cost of parts of like kind and quality.

This construction does not divest the statute of all meaning as appellants contend. Article 5.07–1 shifts a substantial amount of control over the satisfaction of claims from the insurance companies to the policyholders. As stated previously, prior to the statute's enactment insurers could force policyholders to have their vehicle repaired at a specific shop using only the type or kind of parts designated by the insurers. If a policyholder wished to use the services of another shop or to have the repairs made with parts other than those specified by the insurer, the insurance company could threaten not to pay. This statute put an end to that practice. Now automobile insurers can no longer directly

or indirectly limit coverage by refusing to pay for the reasonable cost of parts and repairs simply because the repairs were performed at an unapproved shop or because a policyholder decides to have the repairs made with parts other than those specified by the insurer.

Although we are sympathetic to appellants' concerns regarding the quality of some non-OEM parts, we do not construe article 5.07–1 as requiring insurers to pay for new OEM parts in *every* instance—including those situations where non-OEM parts of like kind and quality are available. Such a holding would overstate the insurers' obligations under both the policy and the statutory scheme and would require insurers to pay for new OEM parts in all situations, regardless of the age or condition of the vehicle prior to the accident or the quality of available non-OEM parts.

At the same time, however, we must also reject appellees' argument that the statute only forbids insurers from *directly* specifying the type, brand, or kind of part with which a vehicle may be repaired under the policy. This argument fails because it disregards the statute's prohibition against *indirectly* limiting coverage. It is foreseeable that insurers could apply economic pressure in order to *indirectly* force policyholders to use a certain type, brand, or kind of part to repair an insured vehicle. By limiting the amount it pays on a claim to the cost of an inferior part, an insurer could thereby violate article 5.07–1 by *indirectly* specifying the brand, type, or kind of parts that the policyholder could, as a practical manner, use to repair the vehicle.[8]

## CONCLUSION

While we share appellants' concerns that policyholders might be coerced into accepting substandard and possibly dangerous replacement parts in some situations, we

---

8. In such a case, the insurer might be liable under some type of breach of contract, Deceptive Trade Practices Act, or other Insurance

Code violation; but as we indicated earlier, that issue is not before us.

cannot say as a matter of law that all non-OEM parts are substandard and that insurers must pay for new OEM parts in every claim, regardless of the age or condition of the covered vehicle prior to the accident or the quality of available non-OEM parts. The conclusion appellants urge us to make goes too far and is contrary to the legislative intent as evidenced by the statutory language and the legislative history. Furthermore, it disregards the weight that must be given to the Department's construction of the statute.

Thus, we hold that article 5.07–1 does not abrogate the "like kind and quality" obligation under the standard Texas personal automobile insurance policy and does not require insurance companies to pay for new OEM parts in the satisfaction of all legitimate claims. Having so concluded, it follows that the facts as pleaded by appellants do not establish a cause of action under article 5.07–1 of the Insurance Code. Accordingly, we hold that the district court properly granted summary judgment in favor of the Department. The district court's judgment is affirmed.