# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00573-CV

**Appellants, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas// Cross-Appellant, Sirius XM Radio, Inc.**

**v.**

**Appellee, Sirius XM Radio, Inc.// Cross-Appellees, Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas**

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-000739, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

This appeal arises from a suit filed by Sirius XM Radio, Inc. to recover franchise taxes paid under protest to Glenn Hegar, Comptroller of Public Accounts of the State of Texas. *See* Tex. Tax Code § 112.052. Following a bench trial, the trial court signed a judgment in favor of Sirius XM ordering the Comptroller to issue a refund. On appeal, the Comptroller challenges the methodology employed by Sirius XM and adopted by the trial court to calculate that portion of Sirius XM's revenue attributable to its business in Texas in tax years 2010 and 2011. *See id.* § 171.106(a). Specifically, the Comptroller challenges certain findings of fact and conclusions of law made by the trial court concerning where Sirius XM's services were performed and how the fair value of those services in Texas should be calculated. Sirius XM, by cross-appeal, asserts that the trial court erred in not allowing it to include certain expenses in its cost-of-goods-sold

deduction. *See id.* § 171.1012. For the reasons that follow, we will reverse the trial court's judgment and render judgment in favor the Comptroller.

## BACKGROUND

*Franchise Tax*

Texas imposes a franchise tax on each taxable entity that does business in this state or that is chartered or organized in this state. *See* Tex. Tax. Code § 171.001(a). Codified in Chapter 171 of the Tax Code, *see id.* §§ 171.0001-.908, the franchise tax represents a tax on the value and privilege of doing business in Texas. *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47 (Tex. App.—Austin 2013, no pet.). Generally, a taxable entity's franchise-tax liability is calculated by first determining the entity's "margin," which is the lesser of 70% of the taxable entity's total revenue, or the entity's total revenue minus certain expenditures as allowed by Chapter 171. *See* Tex. Tax Code §§ 171.101(a)(1) (determination of taxable entity's "margin"), .1011(c) (calculation of total revenue). Pertinent to this appeal, Chapter 171 allows a taxable entity to subtract from its total revenue the cost of goods sold, sometimes referred to as the "COGS deduction."[1] *See id.* §§ 171.101(a)(1)(B)(ii)(a)(1) (allowing taxable entity to subtract cost of goods sold), .1012 (determination of cost of goods sold).

Next, the entity's "taxable margin" is determined by apportioning the entity's "margin" to its business in Texas. *In re Nestle USA*, 387 S.W.3d 610, 615 (Tex. 2012) (orig.

---

[1] Under a third option, not at issue here, a taxable entity may elect to calculate its margin by subtracting certain compensation expenditures from its total revenue. *See* Tex. Tax Code §§ 171.101(a)(1)(B)(ii)(a)(2) (allowing taxable entity to alternatively subtract compensation), .1013 (determination of compensation). Under a fourth option, added by the Legislature in 2013 and not applicable here, a taxable entity may elect to subtract $1 million from its entire business. *See id.* § 171.101(a)(1)(A)(ii); Act of May 27, 2013, 83d Leg., R.S., ch. 1232, § 6, 2013 Tex. Gen. Laws 3104, 3106.

proceeding); *see* Tex. Tax. Code. § 171.101(a)(2). Apportionment is accomplished by "multiplying a business's total margin by an apportionment factor." *See Hallmark Mktg. Co. v. Hegar*, 488 S.W.3d 795, 796 (Tex. 2016). In its simplest terms, an apportionment factor represents the percentage or fractional proportion of an entity's gross receipts from its business in Texas relative to its gross receipts from its business everywhere, including in Texas. *See* Tex. Tax Code § 171.106(a) (describing apportionment); *Hallmark Mktg.*, 488 S.W.3d at 796 (explaining that apportionment-factor numerator "consists of receipts from business done in Texas and the denominator consists of receipts from all business"). Under this formula, "doing more business in Texas generally results in higher franchise taxes." *OGCI Training, Inc. v. Hegar,* No. 03-16-00704-CV, 2017 Tex. App. LEXIS 10096, at *3-4 (Tex. App.—Austin Oct. 27, 2017, no pet.) (mem. op.) (citing *Southwestern Bell Tel. Co. v. Combs*, 270 S.W.3d 249, 258 (Tex. App.—Amarillo 2008, pet. denied)). Finally, the entity's franchise-tax obligation is determined by multiplying the "taxable margin" by the applicable tax rate. *See* Tex. Tax Code § 171.002 ("Rates; Computation of Tax").

In this case, the Comptroller's appeal centers on the apportionment step in the calculation of Sirius XM's franchise-tax liability for the tax years 2010 and 2011; Sirius XM's cross-appeal concerns the COGS deduction for the same tax years.

*Sirius XM's Business Activities*

Sirius XM is a foreign corporation that provides a subscription-based satellite radio service, consisting of more than 150 channels of music, sports, news, talk, entertainment,

3

traffic, and weather channels to subscribers throughout the United States.[2] During the relevant tax years, Sirius XM's headquarters, transmission equipment, and production studios were located almost exclusively outside of Texas. Approximately 70 percent of Sirius XM's programming consisted of original content produced by Sirius XM specifically for its subscribers and could be obtained only by subscribing to Sirius XM's services. This original content was produced from multiple studios owned and operated by Sirius XM, primarily in New York City and Washington D.C. and in smaller remote studios in Cleveland, Los Angeles, Memphis, Nashville, and Orlando. Sirius XM's production from Texas was limited to a channel named "Willie's Place," transmitted five days a week for no more than five hours a day, from a location in Hillsboro, Texas, which Sirius XM did not own or lease. "Willie's Place" included programming from a host named "Billie Mack," who transmitted from his home in Fort Worth.

Sirius XM's primary source of revenue was subscription fees for its satellite-radio services, with most of its customers subscribing on an annual, semi-annual, quarterly, or monthly basis. Sirius XM subscribers received Sirius XM's programming using satellite-enabled radios, and most of Sirius XM's new subscription growth came from purchasers and lessees of new and used automobiles equipped with satellite-enabled radios. The integrated circuits, or "chip sets," for these satellite-enabled radios included the encryption, conditional access, and security technology necessary to exclusively access Sirius XM satellite radio.

Sirius XM did not manufacturer or provide the radios to its subscribers. Instead, subscribers typically purchased or leased vehicles with the radios already installed by the

---

[2] The underlying facts in this case are largely undisputed. The following facts concerning Sirius XM's business activities are taken from the trial court's unchallenged findings of fact and conclusions of law and from the undisputed evidence presented at trial, including a list of 72 stipulations submitted by the parties as a joint exhibit.

4

manufacturer or dealer.  Sirius XM did, however, subsidize a portion of the radio manufacturing costs to reduce the hardware price to consumers.  In addition, Sirius XM had agreements with major automakers to incentivize them to install the satellite-enabled radios as factory or dealer-installed equipment in their vehicles.  Sirius XM refers to the payments it made pursuant to these agreements as "revenue shares and hardware subsidies," with "revenue shares" computed on a percentage of subscription revenue and "hardware subsidies" computed as a flat fee per vehicle.

*Sirius XM's Franchise-Tax Dispute*

Sirius XM timely filed Texas franchise-tax returns for tax years 2010 and 2011, in which it calculated its margin primarily from the total revenue generated by its subscriptions.  For tax year 2010, Sirius XM calculated its taxable margin by subtracting its cost of goods sold from its total revenue.  *See* Tex. Tax Code § 171.101(a)(1)(B).  For tax year 2011, Sirius XM determined that the total cost of goods sold was less than 30% of Sirius XM's total revenue and, therefore, calculated its margin by deducting 30% of Sirius XM's total revenue.  *See id.* § 171.101(a)(1)(A).  Sirius XM then apportioned its reported subscription receipts for each year based on the locations where it produced its programming for broadcast and on the relative costs of those activities in Texas and outside Texas. *See id.*  § 171.103.

The Comptroller subsequently audited Sirius XM's 2010 and 2011 returns and concluded that Sirius XM had incorrectly computed its tax liability.  Specifically, the Comptroller's auditor determined that Sirius XM's apportionment of its subscription receipts was incorrect because, in the Comptroller's view, the service provided by Sirius XM in Texas was the "service of unscrambling the radio signal," not the production of satellite programming, and this service occurred "at the radio receiver."  During the audit, Sirius XM informed the

5

Comptroller that it had undercalculated its COGS deduction. In part, Sirius XM requested an adjustment to its COGS deduction to include the revenue share and hardware subsidies that it had paid to automobile manufacturers to install satellite-enabled radios.

At the conclusion of the audit, the Comptroller adjusted Sirius XM's apportionment factor to reflect the percentage of Sirius XM subscribers in Texas, which was approximately 8 percent of total subscribers to Sirius XM. In addition, while the Comptroller allowed Sirius XM to include certain requested costs in calculating its COGS deduction, it did not allow Sirius XM to include the revenue share and hardware subsidies. In sum, the audit resulted in an additional tax assessment of $738,898 for tax year 2010 and an additional tax assessment of $1,458,682 for tax year 2011. Sirius XM paid the additional tax and interest under protest and then filed suit in district court to obtain a refund. *See id.* § 112.052.

Following a bench trial, the trial court rendered a judgment in favor of Sirius XM and issued findings of fact and conclusions of law. In part, the trial court concluded that the Comptroller's adjustment to Sirius XM's apportionment factor was incorrect and that Sirius XM was entitled to a refund. However, the trial court upheld the Comptroller's decision to deny Sirius XM's request to include revenue share and hardware subsidies in its revised COGS deduction. These cross appeals followed.

**STANDARD OF REVIEW**

The parties challenge several of the trial court's findings of fact and conclusions of law. We review a trial court's findings of fact following a bench trial for legal and factual sufficiency under the same standards we apply to jury verdicts. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When findings of fact are filed and unchallenged, "they are binding on an

6

appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). We review a trial court's conclusions of law under a de novo standard of review. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

To the extent the parties' issues on appeal concern the proper construction of the franchise-tax statute, these also are questions of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Where the statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would lead to absurd results. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). On the other hand, if a statute is ambiguous, we defer to the interpretation of the statute made by the administrative agency charged with its enforcement, so long as the interpretation is reasonable and does not contradict the statute's plain language. *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs*, 524 S.W.3d 734, 739 (Tex. App.—Austin 2017, no pet.) (quoting *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628-30 (Tex. 2011)); *see Feiss v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006).

## ANALYSIS

*Apportionment*

In two issues on appeal, the Comptroller challenges those findings of fact and conclusions of law underlying the trial court's determination that "[t]he apportionment factors Sirius XM reported on its returns for Report Years 2010 and 2011 were consistent with the fair value of Sirius XM's service performed in Texas" and that "Sirius XM is entitled to a refund for

7

the additional tax resulting from the amount by which the Comptroller's apportionment factors exceeded Sirius XM's apportionment factors."

As previously discussed, for those taxable entities that conduct business in multiple states, apportionment is designed to limit the entity's franchise-tax liability to that revenue attributable to business conducted in Texas. *See Hallmark Mktg. Co.*, 488 S.W.3d at 796. Critical to the apportionment step in calculating a taxable entity's franchise-tax liability is the determination of the entity's gross receipts from "its business done in this state." *See* Tex. Tax Code § 171.103(a). Section 171.103(a) states that when calculating total gross receipts from "business done in this state," a taxable entity must include receipts from "each service performed in this state." *Id.* § 171.103(a)(2). Similarly, the Comptroller's rules provide that receipts from sales of a services are apportioned to the "location where the service is performed." 34 Tex. Admin. Code § 3.591(e)(26) (2017) (Tex. Comptroller of Pub. Accounts, Margin: Apportionment). If services are performed both inside and outside of Texas, the receipts are apportioned based on the fair value of the services that are rendered in Texas. *Id.*

In this case, there is no dispute that Sirius XM conducts business both in and outside of Texas and that, as a result, Sirius XM must apportion its margin based on the percentage of gross receipts from its business done in Texas. *See id.* § 171.106(a). In addition, both parties acknowledge that the gross receipts at issue are receipts received by Sirius XM from subscribers in Texas and that these subscription receipts must be apportioned based on the fair value of the services performed by Sirius XM.[3] *See* 34 Tex. Admin. Code § 3.591(e)(26). Consequently, the parties' dispute centers on whether a Texas subscription receipt is a receipt

---

[3] Although not all of Sirius XM's revenue was from subscriptions, because it represents the bulk of Sirius XM's revenue, the parties have agreed for purposes of this litigation that all of Sirius XM's revenue is subscription revenue.

from a "service performed *in this state*," as that phrase is used in Section 171.103(a)(2). *See* Tex. Tax Code § 171.103(a)(2) (emphasis added).

The Texas Supreme Court, construing the phrase "services performed within Texas" in a predecessor to the current version of franchise-tax statute, has stated that "the act done . . . must be located in Texas. It [is] the localization of the transaction in Texas and not the place of physical handing over or receiving of money that [is] significant." *Humble Oil & Refining Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967). Later, in 1980, the Comptroller issued a decision and, citing *Humble Oil*, determined that the place "where 'the act is done'" determines the geographical character of the receipts derived from the performance of a service." Tex. Comp. Pub. Acc'ts Hearing No. 10,1028 (1980) (quoting *Humble Oil*, 414 S.W.2d at 180). Finally, this Court, relying on both the *Humble Oil* opinion and the Comptroller's 1980 decision, recognized that the phrase "service performed in this state," reasonably construed, means "the act is done in this state." *See Westcott Commc'ns, Inc. v. Strayhorn,* 104 S.W.3d 141, 147 (Tex. App.—Austin 2003, pet. denied). Although both parties emphasize in their appellate briefing that the phrase "service performed in this state" means "the act is done in this state," the parties disagree on whether the trial court correctly applied this interpretation to the undisputed facts in this case.

In relevant part, the trial court made the following findings of fact and conclusions of law:

22. [Sirius XM's expert] performed an analysis determining the percentage of value-producing activities in Texas, as compared to those outside of Texas based on the cost of those activities. . . . [Sirius XM's expert's] analysis is a credible method for determining fair value. . . .

 . . .

9

24.   Sirius XM's receipt-producing, end-product act was the production and distribution of more than 150 channels of music, sports, news, talk and entertainment programming.  More than 70% of Sirius XM's channels were comprised of original content produced by Sirius XM.

On appeal, the Comptroller first challenges the trial court's finding that Sirius XM's "receipt-producing, end-product act" was "the production and distribution" of Sirius XM programming.  In part, the Comptroller asserts that the finding is inconsistent with the where-the-act-is-done standard as articulated in the Comptroller's 1980 decision.  *See* Tex. Comp. Pub. Acc'ts Hearing No. 10,1028 (1980).  In that decision, the Comptroller considered how to allocate receipts derived from the broadcasting of advertisements from a television station in Lubbock, Texas, to a transmitter tower in Lubbock (for broadcast to a Texas audience) and to a transmitter tower in Caprock, New Mexico (for broadcast primarily to a New Mexico audience).  *Id.*  After construing the phrase "service performed in this state" to mean where "the act is done," the Comptroller concluded that "the amounts paid by [the taxpayer's] customers for the act of broadcasting their commercial messages on the frequency . . . from Lubbock, Texas, 'should be denominated 'receipts from business done in Texas.'"  *Id.*  Conversely, receipts paid by customers to the taxpayer for broadcasting their commercial messages on the frequency from Caprock, New Mexico, should not be characterized as Texas receipts.  *Id.*

In reaching this conclusion, the Comptroller rejected the Franchise Tax Division's suggestion to calculate apportionment based on the taxpayer's property and payroll in Texas versus its property and payroll in New Mexico.  *Id.*  The Franchise Tax Division had argued that "but for" its broadcast location in Lubbock, the taxpayer would not have had any message to broadcast from Caprock, New Mexico, and thus, a portion of the taxpayer's receipts from its

10

broadcasting from New Mexico should be attributed to Texas. In rejecting this argument, the Comptroller explained:

> To accomplish the goal of giving independent meaning and significance to the receipts factor from sales of services of a corporation, . . . the phrase "services performed within Texas" . . . must be construed as "units of service sold, the performance of which occurs within Texas," thereby shifting the focus geographically from every activity performed by a corporation that generates service receipts, to those specific, *end-product acts* for which a customer contracts and pays to receive. If no distinction between *receipt-producing activities* versus non-receipt-producing, albeit essential, support activities were made, no independent meaning could be given to the "receipts from sales of services" factor . . . .

*Id.* (emphasis added).

Here, relying on this language from the 1980 decision, the Comptroller argues that although the trial court's findings and conclusions correctly recognize that the receipt-producing, end-product-act test is the standard for determining where an "act is done" (and thus, where the service is "performed" for purposes of apportionment), the trial court misapplied this standard when it concluded that (1) the location of Sirius XM's "receipt-producing, end product act" was the location of its "production and distribution" activities and, (2) as a result, the fair value of Sirius XM's services could be determined from the costs of those activities. The Comptroller asserts that, based on the court's unchallenged factual findings and the evidence presented, "production and distribution" are only "non-receipt-producing, albeit essential, support activities," and "the only activity that could even plausibly be described as the 'receipt-producing, end-product' act is the actual performance of audible radio service for the customer." In other words, in the Comptroller's view, the evidence is insufficient to support the trial court's finding because Sirius XM's service was the providing of radio programming through satellite-enabled

11

radios, and therefore, every subscription receipt from a Texas customer is properly characterized as a receipt from a "service performed in this state." *See* Tex. Tax Code § 171.103(a)(2).

We agree that the Comptroller's interpretation of where the "service [is] performed" to mean where the "'receipt-producing, end-product' act is done," as first articulated in the Comptroller's 1980 decision and by the trial court in this case, is a reasonable construction of the franchise-tax statute. Section 171.103(a)(2) does not define "service performed in this state" or otherwise provide guidance on how to determine where a service is performed. *See Hegar v. Autohaus LP*, 514 S.W.3d 897, 903 (Tex. App.—Austin 2017, pet. denied) (explaining that when statute contains undefined term, the term is typically given its ordinary meaning unless "a different, more limited, or precise definition is apparent from the term's use in the context of the statute" (quoting *Southwest Royalties v. Hegar*, 500 S.W.3d 400, 404-05 (Tex. 2016))). In addition, Sirius XM has not offered an alternative construction of the phrase "service performed in this state," and the Comptroller's construction does not conflict with the plain language of the statute.[4] *See id.*; *see also Texas Dep't of Ins. v. American Nat'l Ins.*, 410 S.W.3d 843, 855 (Tex. 2012) (adopting agency's interpretation, noting that it "is reasonable, was formally promulgated, and is not expressly contradicted by the [statute]"). In fact, this Court has previously considered the phrase "service performed in this state," and although we did not reference the end-product-act standard expressly, we concluded that the Comptroller's interpretation of that phrase as expressed in the 1980 decision was a reasonable interpretation and then applied that interpretation to the

---

[4] In its appellees' brief, Sirius XM does not assert that the Comptroller's interpretation of where "a service [is] performed" is unreasonable or that another reasonable interpretation exists. *See* Tex. Tax Code § 171.103(a)(2). In fact, Sirius XM seems to acknowledge that a "service [is] performed" in Texas if the "act done" to produce the income occurs in Texas. Consequently, the parties' dispute centers on whether the trial court misapplied the standard "by looking to the locations of Sirius XM's production and transmission activities."

12

facts in that case. *See Westcott*, 104 S.W.3d at 146-47. As a result, the trial court was correct to the extent it concluded that the "receipt-producing, end-product act" is the proper standard for determining where a "service [is] performed" when apportioning services under Section 171.103 of the Tax Code.

Applying this standard here, we also agree with the Comptroller's contention that the evidence is insufficient to support the trial court's finding regarding Sirius XM's "receipt-producing, end-product act." The evidence establishes that the service for which Sirius XM's customers contracted, and that resulted in the subscription revenue at issue, was the receipt of Sirius XM programming. Per the terms of that contract, each subscription was "tied to one receiver." In addition, access to the Sirius XM programming was limited to satellite-enabled radios and, more specifically, to those satellite-enabled radios in which the radio receiver had unscrambled and decoded the encrypted Sirius XM satellite signal. The receipt-producing, end-product act that allowed each Sirius XM customer to receive Sirius XM programming occurred when Sirius XM decrypted the program by activating or deactivating the customer's chip set in their satellite-enabled radio, which Sirius XM could do remotely. This act occurred where the satellite-enabled radio was located, which can reasonably be presumed to be where the Sirius XM customer resided, as the Comptroller presumed here.[5]

In its appellee's brief, Sirius XM asserts the trial court's finding as to where Sirius XM performed services is correct and emphasizes that franchise taxes in Texas are "origin based" and not "market based." Sirius XM reasons that when services are transmitted remotely,

---

[5] According to the parties' stipulations, admitted into evidence at trial, Sirius XM did not track subscription revenue on a state-by-state basis and could not identify the percentage of its listening audience that was in Texas. Accordingly, the Comptroller used the subscribers' addresses to geographically categorize Sirius XM's receipts.

the relevant activities for purposes of determining where "the act is done" is not where the audience is located but, instead, where "the service provider performs its service-related activities." According to Sirius XM, the trial court correctly applied this origin-based standard "by looking to the locations of Sirius XM's production and transmission activities."

In support of its argument, Sirius XM relies on this Court's decision in *Westcott Communications*, 104 S.W.3d at 141-147. That case concerned the franchise-tax liability of a company, Westcott Communications, that "produced educational, informational, and training programming" in Texas and subsequently delivered that programming to subscribers throughout the nation via satellite broadcast and videotape. *Id.* at 144. Westcott's customers included schools, law enforcement personnel, nurses, and other professionals. The issue before this Court was whether the taxpayer's receipts from training programs delivered by satellite to its subscribers were properly characterized as receipts for "services performed in this state." *Id.* To answer this question, the Court began by examining the phrase "service performed in this state" in the franchise-tax statute and, based on the Comptroller's 1980 opinion, concluded the phrase means the "act is done" in Texas. *Id.* at 146 (noting that "construction of statute by an administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and consistent with the statute" and will be accepted by the court "even if other reasonable interpretations exist"). Then, applying this interpretation to the facts presented, the Court concluded, "[i]t is clear that where the 'act is done' in this case is in Texas, rather than in the states of the subscribing clients." *Id.* at 147. Consequently, the Court held, it was reasonable for the trial court to conclude that Westcott's training services were performed in Texas and that receipts from these services "were covered under the franchise tax statute as gross receipts from business done in the state." *Id.*

14

In this appeal, Sirius XM argues that it provided a service virtually identical to that provided by the taxpayer in *Westcott* and that based on this precedent, this Court should hold that the trial court reasonably concluded that Sirius XM's services were performed at the location of production and distribution.[6] Although *Westcott* is factually similar to this case in some respects, we disagree that it is controlling as to where Sirius XM's "services [were] performed." *See* Tex. Tax Code § 171.103(a)(2).

Like the taxpayer in *Westcott*, Sirius XM was not paid by its subscribers in 2010 and 2011 to broadcast or produce television or radio programming. *See* 104 S.W.3d at 147. In other words, unlike the taxpayer in the Comptroller's 1980 decision, which received its revenue from advertisers for the act of transmitting advertisements to an audience, both Westcott and Sirius XM received their revenue from content subscribers, i.e., its audience. In addition, like the taxpayer in *Westcott*, which the Court noted was paid "to provide training to its customers," Sirius XM was paid to provide entertainment to its subscribing customers. *See id.*

The Court in *Westcott* emphasized, however, that the services provided by Westcott via satellite were "unlike a cable television provider" because Westcott went "well beyond providing a broadcast signal to its customers." *Id.* Instead, Westcott's services included "live broadcast sessions, interactive question-and-answer sessions, testing, and other educational and

---

[6] Although not entirely clear, Sirius XM seems to suggest that *Westcott* stands for the general proposition that under an origin-based standard, when programming is produced and transmitted to another state, where the "act is done" is where the "service provider[] performed its service-related activities" and not where the receiving customer is located. This proposition, however, ignores the fact that, in some cases, the location of the service provider's performance (depending on where it performs its end-product act) and the location of the audience may be the same. We do not read *Westcott* as broadly as Sirius XM suggests. The Court's conclusion in *Westcott* that the "act was done" in Texas—the place where Westcott produced and broadcast its programming from—was based on and limited to the facts presented in that case.

15

training services." *Id.* In other words, in *Westcott*, the record established that the taxpayer developed training programs for their customers and that its customers contracted to receive programs to meet their specific needs. *See id.* at 147, 150. For example, the format and substance of the training that Westcott would have produced and transmitted to its law enforcement clients would not necessarily have been the same as what it would have produced and transmitted to other clients, such as educators and healthcare providers. While satellite transmission of the programs may have provided a convenience to Westcott's customers, it was primarily the substance of the programs that its customers were paying for, and those programs were developed and produced exclusively in Texas. *See id.*

In contrast, the undisputed findings and evidence here show that Sirius XM's programming was available to any person with a satellite-enabled radio that contracted with Sirius XM to receive programming and that the purpose of the contract, from the standpoint of the subscriber, was the ability to receive the programming through his or her satellite-enabled radio. In addition, although Sirius XM's programming included original content produced by Sirius XM and available exclusively to its subscribers, nothing in the record suggests that Sirius XM contracted with individual subscribers or groups of subscribers to develop or produce specific programming.

We conclude that the trial court's finding that the receipt-producing, end-product act was "the production and distribution" of Sirius XM programming is not supported by the trial court's unchallenged underlying factual findings and the evidence presented at trial. Consequently, we must also conclude the trial court's finding that the comparative cost of these activities in and outside Texas is a "credible method for determining fair value" of Sirius XM's services is not supported by the record. As a result, the trial court erred in concluding that "[t]he

16

apportionment factors Sirius XM reported on its returns for Report Years 2010 and 2011 were consistent with the fair value of Sirius XM's service performed in Texas." We sustain the Comptroller's issues on appeal.

*Cost-of-Goods-Sold Deduction*

As previously discussed, franchise taxes are assessed against a "taxable margin." *See* Tex. Tax Code § 171.002(a). Before apportionment, Section 171.101 permits an entity to subtract its "cost of goods sold" from its total revenue when calculating its margin. *See id.* § 171.101(a)(1)(B) (providing that taxable entity may elect to subtract either cost of goods sold or compensation). During the audit process, Sirius XM requested permission to revise its COGS deduction to include the revenue share and hardware subsidy payments that it made to automobile manufacturers in exchange for the manufacturers' installation of satellite-enabled radio in their vehicles. The Comptroller rejected this request. Similarly, the trial court's findings and conclusions included the following:

> 5. Sirius XM's Revenue Share and Hardware Subsidies expenses are not includable in Sirius XM's cost-of-goods-sold deduction.

In its conditional cross-appeal, Sirius XM challenges this conclusion.

Section 171.1012 addresses how a taxable entity's cost of goods sold is calculated. *See id.* § 171.1012 (determination of cost of goods sold). Under the COGS deduction, a taxable entity may subtract, among other things, "all direct costs of acquiring or producing the goods [sold]," including labor, certain materials, handling, storage, depreciation, rent, repairs and maintenance, from its total revenue. *Id.* § 171.1012(c). "Production" is broadly defined to mean "construction, manufacture, development, mining, extraction, *improvement, creation*, raising, or

17

growth." *Id.* § 171.1012(a)(2) (emphasis added). For purposes of calculating cost of goods sold, "goods" is defined as "real or tangible personal property sold in the ordinary course of business of a taxable entity." *Id.* § 171.1012(a)(1). "Tangible personal property" is defined as "personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner." *Id.* § 171.1012(a)(3)(A)(i). In subsection (ii), "[t]angible personal property" is further defined to include "films, sound recordings, videotapes, *live and prerecorded television and radio programs*, books, and other similar property embodying words, ideas, concepts, images, or sound." *Id.* § 171.1012(a)(3)(A)(ii) (emphasis added). "Tangible personal property" does not include "services." *Id*. § 171.1012(a)(3)(B).

Sirius XM contends that when these statutory definitions are applied to the undisputed facts in this case, it is clear that the trial court was incorrect in concluding that revenue share and hardware subsidies are not costs of goods sold.[7] According to Sirius XM, the record establishes that during the relevant tax years, it sold "goods"—namely, "tangible personal property" in the form of "live and prerecorded . . . radio programs"—and that these goods were "produced" within the meaning of Section 171.1012(a)(2)—that is, "improved or created"—when the programs were actually heard by subscribers in their automobiles. Sirius XM reasons that because the satellite-enabled radios were necessary for subscribers to receive Sirius XM's

---

[7] The trial court's findings and conclusions describe Sirius XM's satellite-radio subscription as a "service" for purposes of apportionment. The Comptroller points out that Sirius XM has not challenged those portions of the trial court's findings or otherwise argued that it does not provide a "service." In addition, the Comptroller argues that Sirius XM has judicially admitted that it was performing a "service." *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) ("A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact."). For purposes of analyzing Sirius XM's cross-appeal, we will assume that Sirius XM has not waived and is not otherwise precluded from asserting that it provided "goods" to its subscribers.

18

satellite-radio programming in their automobiles, its payments to automobile manufacturers related to those radios are deductible as a cost of producing the "live and prerecorded . . . radio programs."

The Texas Supreme Court recently addressed a similar argument in *Hegar v. American Multi-Cinema, Inc.*, No. 17-0464, __ S.W.3d __, 2020 Tex. LEXIS 269 (Tex. Apr. 3, 2020). In that case, the Texas Supreme Court considered whether a movie theater sells tangible personal property, within the meaning of Section 171.1012, when it exhibits films to its ticket-purchasing patrons. *Id.* at *2. The taxpayer, a movie theater chain, sought to calculate its cost of goods sold to include "costs it incurred in exhibiting films, such as film acquisition costs and costs associated with the theater auditoriums themselves." *Id.* at *4. The movie theater chain asserted that under the definition of "tangible personal property" in subsection (ii), a "film" was tangible personal property and that it sold films in the ordinary course of its business by exhibiting the films to its viewing audience. *See id.* at *9; *see also* Tex. Tax Code § 171.1012(a)(1), (3)(A)(ii). In rejecting this argument, the Texas Supreme Court explained that "[a]lthough [subsection (ii)] does not contemplate a particular medium, it does require that the 'medium in which the property is embodied' is intended or reasonably likely to be mass-distributed." *American Multi-Cinema*, 2020 Tex. LEXIS 269, at *22. Consequently, the court held that with respect to "goods" under Section 171.1012, "property with a physical or demonstrable—that is, tangible—presence must be transferred. Transferring a film's creative content alone will not suffice." *Id.* at *16.

Similarly, in this case, "radio programs" are expressly included in the definition of "tangible personal property" under subsection (ii), which if sold, would constitute "goods." *See* Tex. Tax Code § 171.1012(a)(1), .1012(a)(3)(A)(ii). In addition, there can be no dispute that Sirius XM transmitted, and Sirius XM's subscribers paid to receive transmissions of, "radio

19

programs." However, the evidence shows that like the movie-viewing audience in *American Multi-Cinema*, Sirius XM subscribers received only a right to access and listen to the programs' creative content. In addition, although Sirius XM may have remotely transmitted its radio programs to its subscribers in a digital format, nothing in the record suggests that the digital information was transmitted in a manner that would allow a subscriber to access that information again at a later time. *Compare American Multi-Cinema*, 2020 Tex. LEXIS 269, at \*22 n.13 (noting that "some medium is transferred to the consumer" when creative content is transferred in some digital forms of media). Consequently, the record fails to establish that "property with a physical or demonstrable—that is, tangible—presence" was transferred by Sirius XM to its subscribers. *See id.* at \*16. Instead, the transfer to the subscriber was solely that of the creative content of the radio program, which under the Texas Supreme Court's holding in *American Multi-Cinema,* fails to qualify as a sale of "tangible personal property." *See* Tex. Tax. Code § 171.1012(a)(1).

We cannot conclude that the evidence establishes that during the relevant tax years, Sirius XM sold "live and prerecorded . . . radio programs" constituting "tangible personal property," as that phrase is used in Section 171.1012. Because the evidence does not establish that Sirius XM sold "goods," the trial court did not err in concluding that its "Revenue Share and Hardware Subsidies expenses [were] not includable in [its] cost-of-goods-sold deduction." Sirius XM's sole issue on cross-appeal is overruled.

## CONCLUSION

The trial court erred in concluding that the apportionment factors reported by Sirius XM accurately reflect the fair value of services performed in Texas during tax years 2010

and 2011.  In addition, Sirius XM failed to establish that its reported cost of goods sold should be revised to include the revenue share and hardware subsidy payments that it made in tax years 2010 and 2011.  Accordingly, the trial court erred in awarding Sirius XM "a refund for the additional tax resulting from the amount by which the Comptroller's apportionment factors exceeded Sirius XM's apportionment factors," and Sirius XM is not entitled to a partial refund. We reverse the judgment of the trial court and render a take-nothing judgment in favor of the Comptroller on Sirius XM's claims.

 

 

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Reversed and Rendered

Filed:   May 1, 2020